## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| KYLE JACKSON, an individual<br><br>    Plaintiff,<br><br>vs.<br><br>CANYON COUNTY, a governmental entity, and its governmental sub-unit, the CANYON COUNTY SHERIFF'S OFFICE,<br><br>    Defendant. | Case No.: 1:13-cv-503-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANT CANYON COUNTY'S MOTION FOR SUMMARY JUDGMENT**<br>**(Docket No. 37)**<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>**(Docket No. 38)** |

Now pending before the Court are (1) Defendant Canyon County's Motion for Summary Judgment (Docket No. 37), and (2) Plaintiff's Motion for Partial Summary Judgment (Docket No. 38). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. BACKGROUND

Plaintiff Kyle Jackson ("Jackson") is a former detention deputy with Defendant Canyon County Sheriff's Office. This case stems from Defendant's firing of Jackson on September 4, 2012. In response to his discharge, Jackson brings this action, asserting two causes of action: (1) violation of the Americans with Disabilities Act ("ADA), and (2) wrongful termination in violation of public policy. Defendant now moves for summary judgment, arguing that (1) Jackson's ADA claim must be dismissed because he was not a qualified individual who could

**MEMORANDUM DECISION AND ORDER - 1**

perform the essential functions of his position as a detention deputy, with or without reasonable

accommodation; and (2) Jackson's wrongful termination claim must be dismissed because there

is no causal connection between his worker's compensation claim and his termination (in

addition to the argument that Jackson could not perform the essential functions of his position as

detention deputy, with or without reasonable accommodation).  Jackson naturally disagrees, and

moves for partial summary judgment himself, arguing that Defendant's "100 percent healed

policy" violates the ADA as a matter of law.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  One of the principal purposes of summary

judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323-34 (1986).  It is "not a disfavored procedural shortcut," but is instead

the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and

prevented from going to trial with the attendant unwarranted consumption of public and private

resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute

as to any *material* fact – a fact "that may affect the outcome of the case."  *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and

the Court must not make credibility findings.  *Id*. at 255.  Direct testimony of the non-movant

**MEMORANDUM DECISION AND ORDER - 2**

must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir.

1999).  On the other hand, the Court is not required to adopt unreasonable inferences from

circumstantial evidence.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

When parties submit cross-motions for summary judgment, the Court must consider each

party's evidence, regardless under which motion the evidence is issued. *See Las Vegas Sands,*

*LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).  The Court must independently search the

record for factual disputes.  *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*,

249 F.3d 1132, 1136 (9th Cir. 2001).  The filing of cross-motions for summary judgment – where

both parties essentially assert that there are no material factual disputes – does not vitiate the

Court's responsibility to determine whether disputes as to material fact are present.  *See id.*[1]

The moving party bears the initial burden of demonstrating the absence of a genuine

dispute as to a material fact.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en

banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such

as affidavits or deposition excerpts) but may simply point out the absence of evidence to support

the nonmoving party's case.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th

Cir. 2000).  This then shifts the burden to the non-moving party to produce evidence sufficient to

support a jury verdict in his favor.  *See Devereaux*, 263 F.3d at 1076.  The non-moving party

must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to

interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex*, 477

U.S. at 324.

---

[1]  While both parties here move for summary judgment, they each raise discrete issues.
Therefore, the at-issue motions do not represent typical dueling cross-motions for summary
judgment in the typical sense.

**MEMORANDUM DECISION AND ORDER - 3**

## III.  DISCUSSION

**A.      Defendant's Motion for Summary Judgment (Docket No. 37)**

   1.      Jackson's ADA Claim

Title I of the ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Disability discrimination claims typically proceed under the familiar *McDonnell Douglas* three-step, burden-shifting framework – first, the plaintiff must establish a prima facie disability discrimination claim; second, if the plaintiff does, the defendant must then articulate a legitimate, nondiscriminatory reason for its conduct; and, third, if the defendant does, the plaintiff must then demonstrate that the articulated reason is pretext for discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *see also Snead v. Metro Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001) (applying framework to ADA claims).

Defendant's Motion for Summary Judgment challenges the first element of the *McDonnell Douglas* framework – that is, whether Jackson can establish a prima facie disability discrimination claim.  *See generally* Mem. in Supp. of MSJ, pp. 3-18 (Docket No. 37, Att. 2). To establish a prima facie disability discrimination claim, Jackson must put forth evidence that (1) he is "disabled"; (2) he is a "qualified individual"; and (3) he suffered an adverse employment action "because of" his disability.  *See Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001).  "At the summary judgment stage, the 'requisite degree of proof necessary to establish a prima facie case . . . is minimal and does not even need to rise to the

**MEMORANDUM DECISION AND ORDER - 4**

level of a preponderance of the evidence.'" *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).  Defendant's Motion for Summary Judgment takes aim at the second of these three elements, arguing that Jackson cannot show that, at the time of his termination, he was qualified as a detention deputy.

The ADA defines a "qualified individual with a disability" as an "individual with a disability who, 'with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999) (quoting 42 U.S.C. § 12111(8)); *see also* 29 C.F.R. § 1630.2(m).  "To determine the essential functions of a position, a court may consider, but is not limited to, evidence of the employer's judgment of a position, written job descriptions prepared before advertising or interviewing applicants for the job, the work experience of past incumbents of the job, and the work experience of current incumbents in similar jobs." *Basith v. Cook Cty.*, 241 F.3d 919, 927 (7th Cir. 2001) (citing 29 C.F.R. § 1630.2(n)(3)).[2]  Further, "[t]he function

---

[2]  29 C.F.R. § 1630.2(n) provides:

(1) In general.  The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires.  The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

> (I) The function may be essential because the reason the position exists is to perform that function;

> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

**MEMORANDUM DECISION AND ORDER - 5**

may be essential because the reason the position exists is to perform that function." 29 C.F.R. § 1630.2(n)(2)(I). An employer has the burden to come forward with evidence of a job's essential functions, in part because "'much of the information which determines those essential functions lies uniquely with the employer.'" *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (quoting *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995)).

     *a.    The Essential Functions of a Detention Deputy*

Defendants have put into evidence the essential functions of a detention deputy. For example, the written job description (and confirmed by Jackson's supervisors) outlines a detention deputy's essential functions, including:

- "Sufficient personal mobility, flexibility, agility, reflexes, and physical strength";

---

(3) Evidence of whether a particular function is essential includes, but is not limited to:

    (I) The employer's judgment as to which functions are essential;

    (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

    (iii) The amount of time spent on the job performing the function;

    (iv) The consequences of not requiring the incumbent to perform the function;

    (v) The terms of a collective bargaining agreement;

    (vi) The work experience of past incumbents in the job; and/or

    (vii) the current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n).

**MEMORANDUM DECISION AND ORDER - 6**

- "Stand[ing] and walk[ing] for long periods of time, lift[ing] up to 50 pounds, respond[ing] physically to restrain inmates, and work[ing] in a detention environment";

- Monitoring inmate activities to "ensure the safety and security of the facility";

- Maintaining "facility security by patrolling the secure areas within and around the detention center";

- Maintaining "facility security be seizing weapons, drugs, contraband, and related items";

- Monitoring inmate behavior in a variety of activities and situations;

- Transporting inmates;

- "Deal[ing] verbally and/or physically with uncooperative, distraught, and hostile inmates";

- "Recogniz[ing] and respond[ing] appropriately to unusual medical, physical, or mental conditions of inmates";

- Performing cell searches and extractions;

- Breaking up inmate fights; and

- Properly use restraints and other mechanisms on violent or combative subjects

Defs.' SOF No. 2 (Docket No. 37, Att. 1); *see also id.* at No. 3 (Jackson agreeing pre-hiring that

he was "physically able to perform the duties and essential job functions," which included

dealing with violence, breaking up fights/disturbances, conducting inmate body searches, and

transporting inmates alone). Defendants go on to point out the time necessary to perform these

alleged essential functions (carried out in three different work units: housing, booking, and

control) – noting that "the vast majority of the essential functions associated with the detention

**MEMORANDUM DECISION AND ORDER - 7**

deputy position are associated with the housing and booking units while only a small portion of the essential functions are associated with the control unit." *See id.* at Nos. 4-5.[3]  In this setting, Defendants finally note the risks associated with placing a detention deputy with a "substantial history of knee instability and dislocations" in the more physically-demanding housing and booking units (and, conversely, the burden on other staff if that detention deputy was restricted only to the control unit). *See id.* at No. 26; *see also* Mem. in Supp. of MSJ, p. 7 (Docket No. 37, Att. 2) ("In short, the detention center cannot be adequately and safely operated unless each deputy can perform their duties in housing, booking, and control.").

For his part, Jackson does not dispute the general duties of a detention deputy as indicated in that position's job description; instead, he questions whether such duties (or certain of them) actually amount to a detention deputy's essential functions, when keeping in mind the work that he and other detention deputies historically performed. *See* Opp. to MSJ, pp. 5-6 (Docket No. 39) ("The time Jackson spent between the three different units, housing, booking, and control, varied depending on the supervisor in charge that particular day.  The responsibilities differed by supervisor and was not a constant.  Additionally, other deputies performed varying levels of duties, such as not being able to walk stairs due to bad backs or knees.").  Moreover, Jackson argues that, any burdens upon other staff in restricting a detention deputy only to the control unit relate to whether a "reasonable accommodation" existed, not whether work in other units amounted to an essential function. *See id.* at p. 6.  In other words, according to Jackson, either the duties identified by Defendants were not essential to being a

_____

[3]  In this respect, Defendants note that, prior to August 7, 2009 (the date Jackson injured his knee while an inmate was attempting suicide), Jackson spent at least 70% of his time working in the housing and booking units, and approximately 30% of his time working in the control unit. *See* Defs.' SOF No. 4 (Docket No. 37, Att. 2).

**MEMORANDUM DECISION AND ORDER - 8**

detention deputy, or he had previously performed those essential functions with a reasonable accommodation.

It is clear to the undersigned that a detention deputy must keep his or her finger on the pulse of the detention center and, in doing so, is frequently placed in unpredictable, dangerous, and physically-demanding circumstances which necessarily reflect the essential functions of the detention deputy position. Still, delineating those essential functions as a matter of law for purposes of this Memorandum Decision and Order is not required when – even if it is assumed that a detention deputy's essential functions are as Defendants describe – a question of fact exists as to whether Jackson was able to perform them without or without a reasonable accommodation.

>   b.   *Jackson's Ability to Perform the Essential Functions of a Detention Deputy With or Without Reasonable Accommodation*

The record establishes that, following his August 7, 2009 knee injury, Jackson experienced difficulty performing certain aspects of his job as a detention deputy. And, it is equally evident that, during this same time-frame, Defendants allowed Jackson to work more sedentary, light-duty shifts in the control unit (as compared to the housing and booking units) as Jackson attempted to recover from his injury. From this (and believing that Jackson's condition would never markedly improve after a re-injury and multiple unsuccessful medical procedures), Defendants contend that "Jackson could not consistently perform the essential functions of his position during the last three years of his employment." Mem. in Supp. of MSJ, p. 9 (Docket No. 37, Att. 2). Defendants' position in this respect is understandable, to be sure; however, the medical record is not so tidy as to justify as a matter of law their decision to terminate Jackson under the ADA.

**MEMORANDUM DECISION AND ORDER - 9**

Here, in an interesting (but still thorny) twist to things, Jackson filed a worker's compensation claim related to his August 7, 2009 injury.  It was in *this* worker's compensation context that Jackson worked less at times and, when he did work, in light duty capacities.  In that worker's compensation setting, Jackson's doctors repeatedly confirmed that he was unable to perform the essential functions of the detention deputy position.  *See* Defs.' SOF Nos. 6-10, 14-18, 20-25, 28, 32-33 (Docket No. 37, Att. 1).  This all changed in July 2012 when the State Insurance Fund's ("SIF") orthopedist, Dr. Joseph Daines, conducted an independent medical evaluation of Jackson's right knee, and concluded in relevant part:

> I feel that his objective examination dos not indicate severe instability in his patellofemoral joint and I am not sure that medial reefing will benefit him.  The hallmark of treatment of patellofemoral joint problems is conservative and with dedicated re-strengthening of especially the quad muscle but in reality, all muscles that are involved in knee functioning.  If he is left with residual symptoms that preclude his return to certain forms of work, then he might have to be cautious in a return to them.  *I am not sure that his job as a deputy sheriff in the jail would fall in the category of work that he could not tolerate.  I therefore believe that he can return to full duty and this includes full duty as a detention deputy at the Canyon County prison in Caldwell.*
>
> . . . .
>
> I do not feel that further surgery is indicated at this time.  His clinical examination is really negative for objective evidence of patellofemoral instability.  His apprehension test is completely negative.  His patellofemoral joint seems to track in the midline, his retinacular tissues are not overly tight or loose on either the medial or lateral sides of his patellofemoral mechanism, and his knee was not reactive at the time of my examination, with any evidence of chronic knee effusion, etc.  I do not feel he will benefit from medial reefing surgery to his right patellofemoral joint and I am concerned that he has a tendency to form excessive scar after surgeries to his right knee.  *I do feel that his best defense is a self-directed exercise program and strengthening program and stretching program to the right knee, and I think if he will do this religiously, he will probably improve his right knee functioning.*
>
> . . . .
>
> *After he has completed a dedicated muscle re-strengthening program for his right knee, I feel that he would be able to return to full duty work without restrictions.*

**MEMORANDUM DECISION AND ORDER - 10**

Ex. 1 to Jackson Dep., attached as Ex. A to Nelson Decl. (Docket No. 37, Att. 4) (emphasis added).

Thus, as of August 2012 (the SIF received Dr. Daines's report on August 15, 2012), the medical record reveals, at the very least, a disagreement between medical providers/examiners concerning Jackson's abilities to perform the essential functions (whatever those might exactly be (*see supra*)) of his job as a detention deputy.[4]

Whatever Jackson's actual abilities were at that time is unknown;[5] what is clear, though, is that Dr. Daines's report represents the finish line of Jackson's worker's compensation case. *See, e.g.*, Ex. C to Nelson Decl. (Docket No. 37, Att. 6) (8/15/12 record of phone call from SIF to Lieutenant Daren Ward, informing latter that "IME physician's opinion that [Jackson] can return to full work activities"); *see also* Ex. I to Thomas Aff. (Docket No. 39, Att. 11) (8/16/12 letter from SIF to Jackson, informing latter that "Dr. Daines has . . . released you to return to work without restrictions.").[6]  In turn, because Defendants fired Jackson soon thereafter, it also represents the beginning of what has now transformed into his ADA claim.

---

[4] That there is no unequivocal release of Jackson back to full duties as a detention deputy (even when coupled with Jackson's medical history) is insufficient to compel a finding on summary judgment that Jackson was incapable of performing the job's essential functions when he was terminated.  To the contrary, Dr. Daines' report, as equivocal as it may be, injects a dispute of material fact on this lynchpin issue which, when construed in Jackson's favor, auger against summary judgment.

[5] This becomes obvious when looking at the parties' starkly contrasting arguments on this point.  *Compare* Mem. in Supp. of MSJ, p. 7 (Docket No. 37, Att. 2) ("Jackson was unable to perform the essential functions of his position with or without reasonable accommodation."), *with* Opp. to MSJ, p. 8 (Docket No. 39) ("Contrary to Defendants' claims, Jackson could perform the essential job functions without accommodation.").

[6] It is true that Jackson disagreed with Dr. Daines and, even, was "not happy" with his findings "at all."  *See* Ex. C to Nelson Decl. (Docket No. 37, Att. 6) (record of 8/20/12 telephone call between SIF and Jackson).  But this reaction is consistent with his rights under worker's compensation law and  does not operate to overcome the import of Dr. Daines's report when considering whether to grant Defendants' Motion for Summary Judgment and dismiss Jackson's *ADA* claim.

**MEMORANDUM DECISION AND ORDER - 11**

Notwithstanding the questions surrounding Jackson's ability to perform the essential functions of a detention deputy as of August 2012 (*see supra*), and assuming he could not, the Court's inquiry then asks whether a reasonable accommodation would have allowed Jackson to perform those functions. To comply with the ADA, an employer must reasonably accommodate the employee with a disability unless the employer can show that such an accommodation would impose an undue hardship on the business. *See Braunling v. Countrywide Home Loans Inc.*, 220 F.3d 1154, 1157 (9th Cir. 2000). "Employers must 'engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations.'" *Taysom v. Bannock Co.*, 2013 WL 3322296, *6 (D. Idaho 2013) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir. 2000). "The obligation to engage in an interactive process in inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee." *Taysom*, 2013 WL 3322296 at *6. "As explained in the EEOC's regulations, the interactive process 'should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Id.* (quoting *Barnett*, 228 F.3d at 1121) (internal quotation marks and citation omitted)). "Finding the most appropriate accommodation is best achieved through an informal, flexible interactive process involving both the employer and the employee with the disability." *Taysom*, 2013 WL 3322296 at *6.

Engaging in the interactive process is mandatory. *See Barnett*, 228 F.3d at 1112. "[T]his obligation is triggered either by the employee's request for accommodation or by the employer's recognition of the need for accommodation." *Id.* Employers must demonstrate that they acted in good faith, and may do so by pointing to cooperative behavior that promotes the identification of an appropriate accommodation. *See id.* at 1115. "If an employer fails to engage in the

**MEMORANDUM DECISION AND ORDER - 12**

interactive process in good faith, liability for the failure to provide reasonable accommodations ensues when the employer bears responsibility for the breakdown." *Taysom*, 2013 WL 3322296 at *7 (citing *Barnett*, 228 F.3d at 1115).

Here, Defendants' arguments that they engaged in an interactive process to provide Jackson with a reasonable accommodation largely focus on actions taking place while Jackson's worker's compensation claim was open. *See, e.g.*, Mem. in Supp. of MSJ, pp. 12-13 (Docket No. 37, Att. 2); *see also id.* at pp. 13-18 (arguing that Defendants granted all of Jackson's reasonable accommodation requests during same time-frame). Even if true, and construing this evidence in Jackson's favor at this stage of the litigation, such actions were unrelated to an ADA claim in that the record does not indisputably show that an interactive process followed the issuance of Dr. Daines's report, which, again, prompted the end to Jackson's worker's compensation claim. Arguably, it was at that later point in time that an interactive process was to take place under the ADA – one that, for example, would have presumably discussed the exercise/strengthening/stretching programs that Dr. Daines recommended so that Jackson could return to full duty as a detention deputy. *See supra*.

With all this in mind, issues of fact preclude the entry of summary judgment, dismissing Jackson's ADA claim. Defendants' Motion for Summary Judgment is denied in this respect.

2.    <u>Jackson's Wrongful Termination in Violation of Public Policy Claim</u>

Generally, at-will employees may be terminated "at any time for any reason without creating liability." *Edmonson v. Shearer Lumber Prods.*, 75 P.3d 733, 737 (Idaho 2003). Nevertheless, if an employer fires an at-will employee for reasons that contravene public policy, the employer may be liable. *See Bollinger v. Fall River Rural Elec. Co-op, Inc.*, 272 P.3d 1263, 1271 (Idaho 2012). The Idaho Supreme Court has repeatedly cautioned that this public policy

**MEMORANDUM DECISION AND ORDER - 13**

exception must be narrowly construed; otherwise it could swallow the rule. *See Venable v. Internet Auto Rent & Sales, Inc.*, 329 P.3d 356, 361 (Idaho 2014). As Idaho courts explain, "many activities and interests engaged in by employees benefit the community," but "not all of them are recognized as falling within the public policy exception." *McKay v. Ireland Bank*, 59 P.3d 990, 994 (Idaho Ct. App. 2002); *see also Crea v. FMC Corp.*, 16 P.3d 272, 275 (2000) (this narrow exception exists in order to "balance the competing interests of society, the employer, and the employee in light of modern business experience.").

Terminating an at-will employee contravenes public policy only if the "employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain legal rights or privileges. *Id*. Therefore, to bring a successful claim under the public policy exception, an employee must (1) show that he was engaged in legally protected activity; and (2) that there is a causal relationship between his engagement in the protected activity and his termination. *See Bollinger*, 272 P.3d at 1271. Deciding if a public policy is sufficient to protect an at-will employee from termination is a question of law. *See Van v. Portneuf Med. Ctr.*, 212 P.3d 982, 991 (Idaho 2009).

Here, Jackson alleges that "Defendant[s] fired [him] from his employment because he filed for worker's compensation benefits" and that "Defendant[s] termination of [his] employment and other adverse actions taken against [him] were the legal cause of [his] damages." Compl., ¶¶ 31 & 33 (Docket No. 1). Filing a worker's compensation claim is a protected activity for the purposes of bringing a wrongful termination claim. *See Harris v. Treasure Canyon Calcium Co.*, 132 F. Supp.3d 1228 (D. Idaho 2015) (identifying cases holding

**MEMORANDUM DECISION AND ORDER - 14**

that filing worker's compensation claim represents protected activity).  Even so, the causal

connection between Plaintiff filing a worker's compensation claim and his termination is too

attenuated to support such a claim.

It can be argued that Jackson's termination related generally to his worker's

compensation claim – after all, he was fired after his worker's compensation claim was closed

following Dr. Daines's report suggesting that Plaintiff could return to full duty as a detention

deputy.  *See supra.*  However, it cannot be said that Jackson was fired because he (or someone

on his behalf) filed a worker's compensation claim – exactly what Jackson alleges in his

Complaint.  *See supra.*  Three years transpired between these two events.  Unfortunately for

Jackson, to establish a *prima facie* case of wrongful termination in violation of public policy, the

temporal proximity between an employer's knowledge of protected activity and an adverse

employment action 'must be very close.'"  *Harris*, 132 F. Supp. 3d at 1242 ("Aside from the six-

month gap between the filing of her worker's compensation claim and her termination, Harris

has not put forth any additional, reliable evidence that the two were causally connected.  And,

per established case law, a six-month gap by itself suggests no causality at all.") (quoting *Clark

Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (20-month gap between alleged

protected activity and adverse action suggested "by itself, no causality at all.")) (citing *Hughes v.

Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month period insufficient)).

Because a rational trier of fact could not reasonably conclude that a causal connection

exists between the filing of Jackson's worker's compensation claim and his termination, his

wrongful termination in violation of public must be dismissed.  Defendants' Motion for

Summary Judgment is granted in this respect.

**MEMORANDUM DECISION AND ORDER - 15**

**B.      Jackson's Motion for Partial Summary Judgment (Docket No. 38)**

Jackson himself moves for summary judgment on his ADA claim, arguing that

Defendants maintained a "100 percent healed policy," allowing them to fire Jackson for not

being able to fully perform his employment duties.  *See generally* Mem. in Supp. of MSJ, pp. 6-7

(Docket No. 38, Att. 2).[7]  Jackson contends that such a policy represents a per se violation of the

ADA because it disregards the "qualified individual with a disability" analysis associated with a

disability discrimination claim – namely, whether an "individual with a disability who, 'with or

without reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires.'" *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243,

1246 (9th Cir. 1999) (quoting 42 U.S.C. § 12111(8)).  In this respect, Defendants' at-issue policy

reads in relevant part:

> Effective June 27, 2010 members who are unable to perform their employment duties
> because of injury will no longer be placed in a light duty position.  Members will be
> required to use their sick and vacation time benefit hours to provide them
> opportunity to recover and return to full work status.
>
> . . . .
>
> *Before a member can return to work, they must provide their immediate supervisor*
> *with a written release by an attending physician stating they can go back to full work*
> *status.*

Ex. D to Thomas Aff. (Docket No. 38, Att. 7) (emphasis added).  According to Jackson,

Defendants impermissibly applied this policy as the basis for his firing.  *See* Ex. E to Thomas

---

[7]  Jackson also argues, as a precursor to his "100 percent healed policy"-related
argument, that Defendants "mistakenly perceived Jackson as disabled and not able to work any
position, even though he was released to work."  Mem. in Supp. of MSJ, pp. 5-6 (Docket No. 38,
Att. 2).  To the extent Jackson's Motion for Summary Judgment is premised upon such an
argument in and of itself, it is denied, owing to the issues of fact created by the contrasting
medical opinions relating to his ability to perform the essential functions of a detention deputy.
*See supra*.

**MEMORANDUM DECISION AND ORDER - 16**

Aff. (Docket No. 38, Att. 7) (8/24/12 Notice of Intent to Terminate, stating: "At this time, you have been unable to provide a fitness-for-duty certification releasing you to perform the essential functions of your position without restrictions.").[8]

In response, Defendants argued that, unless Jackson can establish that, at the time of his termination, he could perform the essential functions of a detention deputy with or without reasonable accommodation (essentially that he was a "qualified individual" under the ADA), there can be no violation of any alleged "100 percent healed policy.  *See* Opp. to MSJ, pp. 17-18 (Docket No. 4) (citing *McGregor v. Nat'l R.R. PassengerCorp.*, 187 F.3d 1113, 1116 (9th Cir. 1999); *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 195 (3rd Cir. 2009) (holding that "an employer's '100% healed' policy, even if deemed per se discriminatory, cannot give rise to a finding of liability and relief under the ADA without the statutorily required inquiry into whether those affected by the policy are disabled and able to perform the essential functions of the jobs they seek or desire with or without reasonable accommodation")).  And, as discussed elsewhere in this Memorandum Decision and Order, genuine disputes of material fact on this point exist.

On this template, with inferences now construed in Defendants' favor, Jackson cannot show as a matter of law that he was a "qualified individual" under the ADA for the purposes of then attacking Defendants' alleged "100 percent healed policy."

---

[8]  For the sake of completeness, it should be mentioned that Defendants' policy goes on to state that:

> A member, who after using all leave benefits provided to them by Canyon County and who is not released by an attending physician to return to their full duties, may write a detailed letter to the sheriff asking for other employment opportunities with the office.  These letters will be considered on a case by case basis at the sole discretion of the sheriff.

Ex. D to Thomas Aff. (Docket No. 38, Att. 7)

**MEMORANDUM DECISION AND ORDER - 17**

Additionally, Defendants take issue with characterizing their policy as a "100 percent healed policy" instead of what they contend it actually is, *i.e.*, a policy that requires employees to demonstrate that they can perform the essential function of their employment position. *See* Opp. to MSJ, p. 19 (Docket No. 40). And, in this respect, Defendants argue that, following their participation in an interactive process, they concluded that Jackson could not, in fact, perform the essential functions of a detention deputy with or without accommodation and, as a consequence, terminated him. *See id.*[9] Again, questions of fact surround this issue as well, another reason calling for denial of Jackson's Motion for Summary Judgment.

Owing to the disputes of material fact that now orbit Jackson's Motion for Summary Judgment, it cannot be said as a matter of law that Defendants applied a "100 percent healed policy" as justification for terminating Jackson in violation of the ADA. As a result, Jackson's Motion for Summary Judgment is denied.

## IV.  ORDER

Based upon the foregoing, IT IS HEREBY ORDERED that

1.      Defendant Canyon County's Motion for Summary Judgment (Docket No. 37) is GRANTED, in part, and DENIED, in part, as follows:

        a.      Plaintiff's ADA claim is not dismissed. In this respect, Defendant's Motion for Summary Judgment is DENIED.

---

[9] This argument also segues into Defendants' parallel argument that they never applied a "100 percent healed policy" to Jackson when considering that they historically allowed him to work less and in different capacities as a result of his knee injury. *See* Opp. to MSJ, pp. 18-19 (Docket No. 40). These circumstances all tie back into whether Plaintiff is a "qualified individual" under the ADA and/or Defendants' participation in the interactive process – each of which is infused with disputes of material fact. *See supra*.

**MEMORANDUM DECISION AND ORDER - 18**

    b. Plaintiff's wrongful termination in violation of public policy claim is

dismissed.  In this respect, Defendant's Motion for Summary Judgment is GRANTED.

   2. Plaintiff's Motion for Partial Summary Judgment (Docket No. 38) is DENIED.



DATED:  **September 30, 2016**


_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 19**